Nicole Owens
Federal Public Defender
Melissa Winberg
Rilie Fry
Assistant Federal Defender
Federal Defender Services of Idaho
702 West Idaho Street, Suite 1000
Boise, Idaho 83702
(208) 331-5500

Attorneys for Justin Abbott Facey

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

Honorable Timothy M. Burgess

| | |
|---|---|
| United States of America<br><br>Plaintiff<br><br>v.<br><br>Justin Abbott Facey<br><br>Defendant | No. 3:25-CR-00033-TMB<br><br>**Sentencing Memorandum** |

## Introduction

Justin Facey, by and through counsel, respectfully submits that a sentence of 120 months of imprisonment followed by four years of supervised release is sufficient but not greater than necessary to reflect the sentencing factors in 18 U.S.C. § 3553(a). Mr. Facey is an imperfect person who struggled with untreated, pervasive addiction and mental health concerns for most of his life. His condition deteriorated in the years leading up to his arrest in May 2025. He takes full responsibility for his actions. And still, there is no question that Mr. Facey became involved in criminal activity because of his severe untreated drug addiction. He could not resist accepting employment by a drug leader who promised to pay legal bills with cocaine (his drug of choice, which was rare in Alaska). Then, after his law license was suspended, he resorted to selling drugs to continue his addiction. Mr. Facey is more than the choices he made in the throes of that addiction. He also is someone with immense potential and community support. He has a strong potential for rehabilitation, and the letters of support demonstrate his character when he is free from addiction.

## Presentence Investigation Report Disagreements

### I. Paragraph 105 and 105a: Adjustment for Role in the Offense

The government cannot meet its burden of proving that Mr. Facey was a manager or supervisor, much less of five or more participants or in otherwise

extensive criminal activity. That simply does not fit the facts of the offense. He distributed drugs directly to other drug addicts for their personal use. He allowed other drug users to stay in his home. And he was only peripherally involved with the Sanchez-Rodriguez drug trafficking organization (DTO). He spoke several times with the DTO's leader, Heraclio Sanchez-Rodriguez, in the months before Mr. Sanchez-Rodriguez was arrested, and he was retained by Mr. Sanchez-Rodriguez to represent one of his girlfriends, Tamara Bren. Mr. Facey knew very little about the scope or extent of the DTO and had no authority or control over anyone in the DTO. Accordingly, Mr. Facey objects to the presentence investigation report assessing a three-level increase for being a manager or supervisor. No role-adjustment should apply.

For an aggravating role adjustment to apply, the government must prove facts supporting it by a preponderance of the evidence. *See United States v. Lucas*, 101 F.4th 1158, 1163 (9th Cir. 2024) (en banc). That is a meaningful standard, not an "abstract weighing of the evidence" to see "which side has produced the greater quantum." *United States v. Mezas de Jesus*, 217 F.3d 638, 643 (9th Cir. 2000) (cleaned up), *overruled on other grounds, United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024). The evidence must actually convince the judge "of the truth of the proposition asserted." *Id.* As noted by the First Circuit Court of Appeals, in aggravating role cases, even "[r]elatively small increases in a defendant's offense level can have serious consequences at sentencing.

Thus, upgrading the [offense level] must be based on more than the trial judge's hunch, no matter how sound his instincts or how sagacious his judgment." *United States v. Ortiz*, 966 F.2d 707, 717 (1st Cir. 1992). In this case it would also remove him from First Step Act eligibility and would have a significant impact on his sentence. 18 U.S.C. § 3632(d)(4)(D)(lxvii).[1]

Here the government cannot meet its burden for two reasons: it has failed to identify any participants that Mr. Facey supervised or managed and it cannot prove that Mr. Facey exercised control over others in the DTO.

***First, the government cannot prove that Mr. Facey managed or supervised other participants***. A participant is someone "who is criminally responsible for the commission of the offense." § 3B1.1 cmt. n.1. This means the individual would have to act with knowledge and intention, not as a blind mule or someone who was merely present. They also cannot be an end user

---

[1] The First Step Act allows individuals who have committed certain crimes (including drug trafficking offenses without an aggravated role) to earn time credits for participating in evidence-based recidivism-reduction programs.

For Mr. Facey, losing First Step Act eligibility removes the benefit of the plea agreement. He agreed to recommend no less than the 10-year mandatory minimum (which would have been required had he been convicted of 18 U.S.C. § 924(c)) specifically to preserve his eligibility for First Step Act earned time credit. Without First Step Act credits, Mr. Facey will have no reward for participating in programming while incarcerated.

Thus, even if the guideline enhancement does not directly impact the length of the sentence imposed by the Court, it does significantly impact Mr. Facey's sentence as executed by the Bureau of Prisons and the benefit of the plea agreement.

without intent to further distribute controlled substances. *United States v. Egge*, 223 F.3d 1128, 1133 (9th Cir. 2000) ("merely purchasing drugs from the seller, without more, does not qualify that customer as a participant for the purposes of the section 3B1.1 enhancement").

The government has failed to identify any participants that Mr. Facey supervised or managed. In their objection to the draft presentence investigation report, the government relied on four potential participants outside the DTO: "two drivers, his 'daughter's boyfriend,' [and] Ryan Suchan." The government has not proven that any of them are criminally liable for the commission of the offense. This means they cannot be participants.

The government has not ascertained the identities of the individuals referenced in text messages as a driver or as his "daughter's boyfriend." Nor has it identified communications between Mr. Facey and these individuals. Instead, the government has identified communications between Mr. Facey and other individuals in which he referred to drivers and discussed his daughter's boyfriend. However, these messages are vague and uncorroborated. There is no evidence that these individuals in fact participated in the offense and could be criminally responsible. The government cannot establish that the alleged driver distributed drugs or knew that drugs were being distributed and intended to facilitate the offense. The government cannot establish that the "daughter's boyfriend" became involved in selling marijuana. As to Ryan

Suchan, even if the government could prove that Mr. Facey provided drugs to him, he is an end user who cannot be considered a participant in the offense. *Egge*, 223 F.3d at 1133.

Furthermore, despite seizing all Mr. Facey's electronic devices, the government has not identified communication between Mr. Facey and these individuals, much less communication wherein he demonstrated control over them.

***Second, to the extent the enhancement relies on Mr. Facey's participation in the Sanchez-Rodriguez DTO, the government cannot prove that Mr. Facey exercised control over others.*** "Under this circuit's clear articulation of § 3B1.1[], 'even a defendant with an important role in an offense' cannot receive an enhancement unless there is also a 'showing that the defendant had control over others.'" *United States v. Tat*, 97 F.4th 1155, 1162 (9th Cir. 2024) (quoting *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) (quoting *United States v. Lopez-Sandoval*, 146 F.3d 712, 717 (9th Cir. 1998)). Mr. Facey's participation in the Sanchez-Rodriguez DTO even as "an essential member" "does not bear on whether [he] was an organizer, leader, manager, or supervisor of the criminal activity." *Id.*

The DTO had a clear organizer and structure. Heraclio Sanchez-Rodriguez retained exclusive final control over all participants in the DTO, with other individuals such as Christina Quintana and Tamara Bren playing

significant leadership roles. Mr. Facey, by contrast, had no influence or control over others in the DTO. The evidence shows only that Mr. Sanchez-Rodriguez believed that having a lawyer on call would be beneficial to the DTO, not that Mr. Facey had any authority over anyone else in the DTO. And Mr. Facey's "status" in the organization based on his profession as a lawyer is not a basis for the enhancement here, although it has been properly accounted for in the abuse of trust enhancement. *See* PSR ¶¶106-07.

Mr. Facey's actual contributions to the DTO are limited. He became involved with the DTO as an attorney representing a participant in March 2023—after the DTO had been operating for at least a year. By June 29, 2023, Mr. Sanchez-Rodriguez was arrested and subsequently transported to Alaska and placed in segregation. Unlike Mr. Sanchez-Rodriguez and the other DTO leaders who organized the activities of others, Mr. Facey was unfamiliar with many of the participants and transactions of the DTO. Mr. Facey's participation in the DTO was much less extensive than other members and he did not occupy a leadership position.

Despite these facts, the presentence investigation report determined that Mr. Facey "served a central role within the Sanchez-Rodriguez DTO, greatly assisting Bren's escape from law enforcement; receiving lavish compensation in cash, drugs, and valuable items; and serving as a point of contact within the DTO for legal services." PSR ¶105a. Notably, none of these

meet the legal standard for the enhancement. In other words, all that can be true, and the enhancement still should not apply.

Even so, the PSR is incorrect. Mr. Facey's role was not central to the DTO since he was a peripheral member who began speaking with Mr. Sanchez-Rodriguez near the collapse of the DTO. While Mr. Facey represented individuals who were participants in the DTO, this simply shows that he was retained as an attorney, not that he had a leadership role in the DTO as a whole. He represented Valerie Calip on an unrelated case prior to his first call with Mr. Sanchez-Rodriguez, who retained him to represent Tamara Bren in her state court proceedings.

The assessment that Mr. Facey "greatly assist[ed] Bren's escape from law enforcement" is taken from Mr. Sanchez-Rodriguez's communications. In reality, those communications prove only that Mr. Sanchez-Rodriguez stated that hiring Mr. Facey to represent Ms. Bren would be beneficial. Mr. Facey's actual assistance is unclear. And that does not show his control over others.

In every example submitted by the government to support the enhancement, Mr. Sanchez-Rodriguez alone controlled and directed the actions of others. The government cannot prove that Mr. Facey on his own had any influence or control within the DTO. His involvement was narrowly focused on representing Ms. Bren in her state court proceedings and having conversations with Mr. Sanchez-Rodriguez. Mr. Facey certainly had no

authority over any participants in the DTO and cannot be considered a manager or supervisor within the DTO.

Without the three-level enhancement for being a manager or supervisor, Mr. Facey's total offense level would be 29 (using the methamphetamine purity guideline—his total offense level would be 23 with a variance to the methamphetamine mixture guideline).

## II. Paragraph 113: Offense Behavior Not Part of Relevant Conduct

The information in paragraph 113 is based on unreliable statements that should not factor into the Court's sentencing decision. Mr. Facey's 2022 message was sent during a time of heavy drug use and is an empty statement. *See United States v. Jimison*, 493 F.3d 1148, 1150 (9th Cir. 2007) ("Most of us make empty statements out of frustration from time to time . . . . These exclamations are part of our everyday parlance and don't generally connote any intent to commit violence."). It is contradicted by his actions during the execution of the search warrant and his arrest, where Mr. Facey was cooperative and did not resist or react violently.

The information from other unidentified sources is unreliable and uncorroborated. *See United States v. Franklin*, 18 F.4th 1105, 1114 (9th Cir. 2021) (due process requires some minimal indicia of reliability accompany a hearsay statement introduced at sentencing and "relying on accomplice

hearsay without adequate indicia of reliability violates due process." (cleaned up)). Law enforcement officers found no explosive materials at Mr. Facey's residence and their investigation into whether he ever purchased explosive materials found nothing.

**Argument**

A sentence of 120 months of incarceration is significant punishment and deterrence for Mr. Facey's crime. This case depicts the corrosive effects of drug addiction on an individual's life. Mr. Facey has significant advantages—loving family, caring upbringing, education, intelligence, compassion—but no one is immune to the devastating impact of untreated drug addiction. Mr. Facey was particularly susceptible to addiction due to his mental health issues and the young age at which he first started using drugs. Still, for much of his life he was an extraordinarily functional addict—he graduated from college and law school and maintained a legal practice. But over time drugs altered his priorities—he isolated from others in the community, his boundaries eroded, he was not keeping up with his cases and clients. Ultimately drugs cost him almost everything: his career, his law license, his reputation, and his ability to protect people he cares about. Mr. Facey fell far from his ideals and who he wants to be. But he continues to have significant love and support from those who know him best. And he has profound potential for rehabilitation.

## I. Mr. Facey is an intelligent, compassionate, and caring individual whose best qualities have been eroded by years of severe drug addiction.

Mr. Facey, as demonstrated through the many letters of support submitted by long-time friends and family, is a caring and generous individual who was committed to defending the rights of people who were less fortunate than him. However, he struggled with serious mental health issues that he self-medicated from a young age with drugs. This developed into an uncontrollable addiction that ultimately led him to destroy almost everything of value in his life. That he continues to have many friends and family members supporting him speaks to his character and likelihood of rehabilitation.

### a. Justin Facey grew up in Vermont with a loving family and a strong sense of justice.

Justin was born on May 28, 1980, to John ("Jack") and Patricia Facey in Hanover, New Hampshire. He is the oldest of three boys—Chris is three years younger and Michael is eight years younger. The family moved to Rutland, Vermont, which is a small town of about 15,000, when Justin was young. Jack and Patricia continue to live in the family home in Rutland and have been married for 51 years.



1997 photo of Justin, Chris, Patricia, Jack, and Mike

Justin's early life was stable: rooted in family vacations, extracurriculars, and Catholic values. Justin and his brothers played football and Justin skied competitively. Justin frequently spent time with extended family, including cousins, aunts and uncles.





Jack is an attorney and Justin idolized him growing up. Jennifer Kirn, a long-time friend who met Justin in high school, says, "His dad is his hero."[2] Justin loved spending time talking with Jack about philosophy and going to Red Sox games together.

Growing up in a loving family, Justin developed strong values. Jack describes his son:

> In grade school and high school Justin had a desire and willingness to stick up for anyone who he felt was being bullied

| 1988 Vermont ski trip | or | 2012 Telluride ski trip |
|---|---|---|

> intimidated whether by a teacher or schoolmate. He frequently stood up for friends who were being victimized. In his grade school years, he was frequently asked by his teachers to help his two special needs classmates with their work because the teachers felt he had the patience to do so.

Exhibit A at 1 (Jack Facey letter of support). Justin's brother, Chris, remembers that when he was "bullied in middle school and high school . . . [Justin] stuck up for me multiple times despite not being the biggest kid himself. . . . He put me before his own safety and I'll always respect him for that." *Id.* at 8 (Chris Facey letter of support). Justin's mother remembers him "[standing] up to the football table in the cafeteria because they were bullying Trevor Schaft." *Id.* at 4 (Patricia Facey letter of support). Justin's uncle, Jerry

[2] Telephone interview with defense mitigation specialist on August 24, 2026.

Facey, recalls when Justin "was a teenager and carried his little cousin Bobby to safety after falling out of a tree hanging over the water that broke his arm and badly knocked the wind out of him." *Id.* at 12 (Jerry Facey letter of support).



Chris, Mike, and Justin going to school in 1992

Besides standing up for the little guy, Justin was fun and outgoing. Chris recalls that Justin made "washing dishes fun on the same family vacation. He was pretending to be Maverick from Top Gun using the hose as his fighter pilot weapon of choice and spraying dishes." *Id.* at 7 (Chris Facey letter of support). Justin convinced his friends to get involved in acting in high school. *Id.* He "once wrote a spoof song with his best friend" and convinced the school to play

it. *Id.* When the school "pulled the plug mid way through" the "entire school still wanted to hear the rest of the song" so Justin set up a makeshift concert after school and "plugged a mic into a guitar amp on someone's pickup truck" to sing the song. *Id.*

Justin loved animals from a young age. Chris remembers being five years old when a baby squirrel attached itself to his sneaker and his mother and Justin adopted it. The squirrel was named Rocky and lived in Justin's bedroom for the summer. *Id.* at 8.

**b. As an adolescent, Justin experienced mental health issues—including depression and attention deficit and hyperactivity disorder—that he medicated with drugs, which quickly led to addiction.**

Justin's life was not without difficulty. He struggled with attention deficit and hyperactivity disorder (ADHD) and depression, which were diagnosed but not treated. His mother states, "I know the two biggest challenges Justin faced prior to addiction taking over is that he has ADHD and he suffers from depression." Exhibit A at 5 (Patricia Facey letter of support). Around the same time his mental health issues became apparent, Justin got into drugs. Starting in the 7th grade, he regularly drank and smoked marijuana. By high school he was using cocaine.

Justin was primed for drug addiction.

ADHD and depression were the first strike: each greatly increased his susceptibility to drug addiction. Mayo Clinic, *Drug Addiction (Substance Use Disorder*) (identifying mental health disorders including depression and ADHD as a risk factor making an individual "more likely to become addicted to drugs.")[3]; Sharon Leve et al., *Childhood ADHD and Risk for Substance Dependence in Adulthood: A Longitudinal, Population-Based Study*, PLoS ONE (Aug. 2014) (research shows a childhood diagnosis of ADHD can increase the risk of developing a substance use disorder by three to six percent).[4] Justin's brother Chris says, "Justin suffers from depression but never had the correct tools or diagnosis to properly deal with it. In my humble opinion, that is why he turned to drugs (first alcohol, then marijuana, and on and on until here we are) to medicate himself." Exhibit A at 8 (Chris Facey letter of support).

The second strike was his early age of first use. Sarah William, *Why Our Brains Are Wired for Addiction: What the Science Says*, Stanford Medicine (Aug. 5, 2025) ("Studies have shown that the younger someone is when they

---

[3] Available at https://www.mayoclinic.org/diseases-conditions/drug-addiction/symptoms-causes/syc-20365112.
[4] Available at https://doi.org/10.1371/journal.pone.0105640.

start using a substance, the more likely they are to become addicted — and the more quickly they become addicted.”).[5]

And his drug of choice, cocaine, was the third strike. Cocaine is highly addictive drug that “causes the brain to release large amounts of dopamine at once. . . . Upon first use, cocaine can begin to wire pleasurable associations and memories in the brain that lay the groundwork for addiction. With repeated use, cocaine can begin to change the neural circuitry of the brain and create lasting memories and associations that translate into strong cravings and urges to use.” Hailey Okamoto and Dr. David Miles, *The Most Addictive Drugs: Science-Backed Rankings and What They Mean*, Recovered (June 12, 2026).[6]

With three strikes against him, the consequences of Justin using cocaine as a teenager were predictable and devastating: he became a lifelong addict. Justin quickly turned into a daily user and cocaine remains his drug of choice.

Starting in high school, cocaine addiction caused problems that Justin was unable to control. It interfered with his life and decision making; he did not sleep; he spent all his money on cocaine. While Justin was able to function relatively well as an addict, drugs consumed more and more of his focus and destroyed more of his life as time went on. His brother Mike notes that

[5] Available at https://med.stanford.edu/news/insights/2025/08/addiction-science-human-brain-ancient-wiring.html.
[6] Available at https://recovered.org/addiction/most-addictive-drugs.

although "drugs and alcohol were indeed prominent in his lifestyle [ ], he maintained the work ethic to study for law school, pass the bar, and serve as a PD before finally starting his own practice." Exhibit A at 10 (Mike Facey letter of support).

Even though Justin used cocaine on a near-daily basis through high school, college, and law school, he hid his drug use from most of his family. But close friends were aware of his struggles. Craig Cameron, who met Justin in 1999, says, "We have always been honest with each other about our own successes and failures in life; I came to understand that Justin struggled with bouts of depression and self-medicated at times to escape it. Self-medication is a slippery slope, and we often openly talked about his struggles with substance abuse." Exhibit A at 19 (Craig Cameron letter of support).

**c. Justin's drug use continued after high school.**

After graduating from high school, Justin hoped to become a writer. He worked for a newspaper in Worcester, Massachusetts, and then enrolled in college to get a journalism degree. In 2002, he dropped out of college to travel around the country skiing and kayaking. He returned to college and graduated in 2008.

Christmas 2006



After working for a year in Boston, Justin decided to attend the University of Idaho College of Law. Justin's parents were thrilled. Jack says, "He saw the law not as a status symbol or simply a way to make money, but to stand between ordinary people and the harshest consequences of the system. Becoming a criminal defense lawyer was not accidental for him; it was a conscious commitment to represent others, often at their lowest moments, and to ensure that every person was entitled to dignity and a fair process." Exhibit A at 2 (Jack Facey letter of support). Patricia agrees, "He could now make it his life's work being the one who takes the side of the underdog because he understood that a fair outcome is not necessarily guaranteed, especially to those who have little or no voice and he could be that voice." *Id.* at 5 (Patricia Facey letter of support).




Justin's 2013 law school graduation

Justin interned with the Colorado Public Defender while in law school and returned to Colorado to take the bar exam after he graduated. He provided research and document review on a death penalty case in Colorado for two years. Drugs remained a constant presence, but at the time Justin was able to manage his career despite his addiction.[7]

**d. Justin moved to Alaska in 2016 and his drug addiction took over more and more of his life.**

Through a law school friend, Justin was hired by the Tlingit and Haida tribe, where he worked for a year in Juneau. This was one of the healthiest times in his adult life. Justin went to the gym, kayaked, traveled, and skied. But he wanted to return to criminal defense, so Justin moved to Anchorage to work at the Office of Public Advocacy (OPA). And he began using methamphetamine when he could not access cocaine.

---

[7] High-functioning addicts can maintain apparently normal lives while secretly struggling with substance abuse. "They can function and maintain their responsibilities while they deny and rationalize what they are going through, despite worsening physical and mental health." Natia Matta, *10 Signs That You Are a High-Functioning Addict*, Addiction Center (Dec. 23, 2025) (describing how high-functioning addicts hide their drug use, which often leads to the addiction persisting and prevents early intervention), available at https://www.addictioncenter.com/community/10-signs-high-functioning-addict/. The external success of high-functioning addicts can prevent them from receiving help and treatment. Despite his lengthy addiction, Justin has never received mental health or addiction treatment.

Justin's caseload included juvenile clients and he "often lamented the plight of incarcerated children. . . . he started a fundraiser to buy books for the juvenile jail library, raising around $3,000.00 on two separate occasions, using social media to source donations from his large network of friends around the country, and personally selecting, buying, and hand-delivering the books himself." Exhibit A at 19-20 (Craig Cameron letter of support). Justin "thought that it was bad enough that juveniles were incarcerated in the first place, they should at least be allowed to better themselves through reading." *Id.* at 20. His high school English teacher stayed in contact with Justin, who asked him to be a tutor for a juvenile client who was navigating online school during Covid. "Justin's willingness to go above and beyond for this client reminded me of his commitment to others." *Id.* at 18 (Bill Wiles letter of support).

Justin's first landlord in Anchorage describes "almost a compulsion to defend people who were in need of defense, in particular troubled youths and the homeless. . . . Frequently, I'd catch Justin with a bag full of books that he would be delivering to jailed youths." *Id.* at 23 (Jacob Fiorelli letter of support). Justin also bought pizzas at Costco to deliver them to a homeless shelter. *Id.*

Justin also is a passionate dog lover. In Colorado he rescued a mutt named Pearl and cared for her for 12 years. He was driving with her when they passed a dog food factory, and he found the smell so horrific he committed to never feeding it to her again. Since that day, Justin has homemade gourmet

meals for his dogs. In Anchorage he had a dog named Gideon (after Clarence Earl Gideon from *Gideon v. Wainwright*, 372 U.S. 335 (1963)) and began fostering dogs. "Through our rescue efforts, we each grew our family with additional dogs. Justin added to his family Brady (*Brady v. Maryland*, 373 U.S. 83 (1963)) and Ruth (the queen Ruth Bader Ginsburg)." Exhibit A at 27 (Jessica Falke letter of support).



Brady and Gideon with Justin



Ruth – an elderly deaf Saint Bernard

Justin began his time at OPA with strong reviews.[8]

///

///

[8] Justin's time at OPA is discussed further in the sealed addendum because it includes confidential employment evaluations and juvenile clients.

Justin's passion and compassion for his clients led him to ignore professional boundaries. And his addiction continued to interfere with his ability to practice law effectively. He took the termination hard, and it further destabilized him. In a Facebook post on July 26, 2021, Justin stated:

> I've often said that I have never been more proud of anything than I was to join my heroes, my brother and sister defenders, in their fight.... I believed I was doing what I'd been put on earth to do. Indigent defense wasn't a job description for me, it was my identity, and my dismissal left me so thoroughly devastated that for the first couple of days the only words I uttered were during my daily trips to the liquor store.

Without the structure and support of an office, Justin's weaknesses—including his lack of organization and boundaries—increased. And they were exacerbated by his increasing drug use. On July 24, 2021, Justin opened his own practice. His life continued to spiral out of control with substances but he remained blind to how significantly it impacted him.

### e. Justin formed a close, paternal bond with Lorene[9]

///

///

///

///

///

[9] This section of the brief is filed under seal in the Sentencing Memorandum Addendum due to the sensitive nature of the topics discussed.

#### f. Justin's increasing substance use spiraled out of control, especially in the two years before his arrest.

Justin fell deeper into his addiction. And in doing so, he isolated himself from his family. His judgment, both personally and professionally, suffered. And this spiraling addiction led directly to his involvement in this case.[10]

His then-girlfriend, Lindsay Clauson, reports: "Justin could become intensely focused on his work for hours, days, or even weeks. When he was focused, he was exceptionally capable and dedicated. At the same time, other areas of his life could fall through the cracks." Exhibit A at 29 (Lindsay Clauson letter of support). She saw his struggles with addiction, and she also witnessed behaviors that reminded her of her mother, who has bipolar disorder. *Id.* In a phone interview, Lindsay explained that Justin would enter periods of mania where he would not sleep for five to seven days straight and would work through the night. These times were followed by significant periods of

[10] Persistent addiction changes the brain in many ways, including developing tolerance for the drug and needing increased amounts to get the same effect, having uncontrollable cravings, reducing the ability to experience pleasure from naturally rewarding activities, and "feeling flat, without motivation, lifeless, and/or depressed." National Institute on Drug Abuse, *Drugs, Brains and Behavior: The Science of Addiction* (July 2020), available at https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/drugs-brain.

depression. "He would check out at the house and sleep for days on end. The highs and lows were almost to a point where I could see it, the patterns."[11]

Justin's long-time friend Craig Cameron says, "Our conversations started to occur less frequently after he opened his law office. It became apparent that he was struggling with substance abuse when we did speak occasionally. I worried for his safety at times. Things seemed…dark." Exhibit A at 20 (Craig Cameron letter of support).

Justin was ill-equipped to be a solo practitioner. His organizational difficulties from OPA increased as did his drug use. While he continued to be passionate about fighting for his clients, drug addiction took over more of his time and energy. He failed to properly account for client funds or even keep them separate from other accounts. He missed deadlines and court hearings. His professional and personal life was out of control. At this point in his life, Justin was mostly talk. He was incapable of reliably following through with the legal representation and action he sustained at the beginning of his career.

In March of 2023, Justin received a call from an individual called "Charlie," who he now knows was Heraclio Sanchez-Rodriguez. Justin chatted with him a few times and agreed to represent Tamara Bren in a state court proceeding. He was paid with drugs (most importantly for Justin—pure

---

[11] Telephone interview with defense mitigation specialist on August 21, 2026.

cocaine, his drug of choice and his ultimate weakness), commercial sex, and money. While drug addiction is not an excuse for criminal conduct, it is important context. It is unlikely that Justin would have agreed to speak and work with Mr. Sanchez-Rodriguez if he had not already spent decades buying and using drugs. And cocaine was the biggest carrot anyone could dangle in front of Justin.

Justin's life was truly off the rails. He continued to be compassionate to those in need, *and* he wanted to still be the life of the party. His home became a flop house. He acquired and sold drugs. He provided a place to stay for those with nowhere else to go and he allowed them to use drugs there. Even though Lorene lived in the home with Azella and her boyfriend, Justin cared about them, he thought that baby gates separating Azella from the drugs were sufficient.

By the time Justin's law license was suspended, his practice was in shambles. After it closed following the suspension of his license on February 24, 2025, Justin had no income and no way to pay rent. He began selling everything of value. And he sold drugs. It all came crashing down when his property was searched on April 30, 2025. He was arrested on May 21, 2025, and has remained in custody.

///

///

g. **Justin's time in custody has been his longest period of sobriety since he was a pre-teen, and he is ready to change his life.**

Justin has used substances and alcohol consistently from the age of 12 to 45. He is coming to terms with exactly how much addiction cost him and how far he has gone. He is very remorseful for his actions and those he harmed. He knows he will never practice law again. And he knows he needs help to treat his mental health and addiction.

His friends and family know his true character and that he will recover. They provided numerous examples of Justin's generosity and compassion.

- "One of the clearest examples of Justin's character happened in 2004 at a music festival in Vermont. Historic rain had turned the grounds into deep mud, traffic was backed up for miles, and people who had traveled across the country were encouraged to turn back. The grounds were simply too wet, and vehicles were sinking into the mud. After traveling 2,000 miles and spending nearly two days in traffic, I finally made it through the gates and spotted a familiar face. It was Justin, covered in mud, helping pull strangers' vehicles free. He had already been doing it for more than twenty-four hours. He was not assigned to do it, paid to do it, or looking for recognition. He simply did not want people to miss something that mattered deeply to them. Out of tens of thousands of people, there was Justin, working himself to exhaustion to help people he did not know. He gave me a smile and a big hug, accepted a bottle of water, and went back to helping. That is the epitome of Facey." Exhibit A at 21 (Erin Russell letter of support)

- "In 2016, when my father, Justin's grandfather passed, Justin took his role as the eldest grandchild seriously. He made sure that my 89-year-old mother had an escort and driver to and from the funeral home and struck by her side for the three days of the event. He did this without anyone asking. I loved the way he honored his grandfather by taking care of his grandmother in her grief. He looked at the situation and saw where he was needed." Exhibit A at 13 (Marlene Morris letter of support)

Justin's priorities and actions were clouded by his drug addiction, and he did things he is deeply ashamed of. However, he is capable of redemption and rehabilitation.

Justin's parents have educated themselves about addiction. Jack says, "I have watched addiction strip away the very qualities that once made him stable, reliable, and principled. . . . I have seen genuine remorse in him—remorse that is not about self-pity or avoiding punishment, but about understanding what he has lost and what he has done to others and to himself." Exhibit A at 2 (Jack Facey letter of support). Patricia says, "In the course of our letters, phone calls and personal visits we have come to see Justin accept responsibility for his criminal charges. He understands the serious damage left in the wake of his actions and he is aware that he must spend time in prison for those actions. Justin has been actively participating in substance abuse treatment programs in jail when they have been available to him. He has shown that he is ready to get his life back on track." *Id.* at 5 (Patricia Facey letter of support). Justin is ashamed and remorseful. He is motivated to engage in treatment and disentangle himself from the years of drug use.

His family full-heartedly stands beside him, ready to support him and encourage his sobriety. Mike says, "I personally can vouch that I will help to make sure that light that I can see inside of him can make its way into the

external world." *Id.* at 11 (Mike Facey letter of support). Jerry says, "With the help of his loving extended family, and network of quality people to back him, he can have a second life." *Id.* at 12 (Jerry Facey letter of support). Chris says, "Justin has the potential to contribute immense value to society. I hope to some day see a stronger version of my brother from long ago contributing among us." *Id.* at 9 (Chris Facey letter of support). Patricia confirms, "He has a very large extended family who will wrap their arms around him to help him stay on track." *Id.* at 6 (Patricia Facey letter of support).

## II. A sentence of 120 months of incarceration is sufficient to reflect the seriousness of the offense, promote respect for the law, protect the public, deter criminal conduct, and afford Mr. Facey needed rehabilitation.

A sentence of 120 months is adequate to reflect the seriousness of Mr. Facey's offense while acknowledging both his need for and likelihood of success with treatment. This crime did not happen in isolation, and Mr. Facey is prepared to address the decades of addiction that corroded his judgment and upended his priorities. Addressing his addiction and mental health issues is the starting point, but Mr. Facey will continue to make amends for his actions.

### a. A sentence of 120 months is above the methamphetamine mixture guideline range.

Mr. Facey respectfully requests that this Court use the methamphetamine mixture guideline as the starting point for sentencing. *United States v. Rodriguez*, 382 F. Supp. 3d 892, 898 (D. Alaska 2019)

(concluding that "absent a showing of unique circumstances in a specific criminal matter, the Court will routinely grant downward variances from the Guidelines range for methamphetamine offenses where the base offense level is enhanced due to the tested purity of the methamphetamine"). If Mr. Facey's base offense level is calculated without the purity testing, he would be held responsible for 25.654 grams of methamphetamine mixture. When combined with the fentanyl, the total converted drug weight would be 66.09 kilograms for a base offense level of 20.

With the methamphetamine mixture guidelines as a starting point, it is even more clear that a sentence exceeding 120 months is unnecessary under 18 U.S.C. § 3553(a) and that 120 months is sufficient to reflect the seriousness of the offense.

**b. The requested sentence exceeds that given to other criminal defense attorneys who distributed drugs and is sufficient to reflect the seriousness of the offense and deter others.**

A decade of imprisonment is a hefty punishment. The sentence imposed need not consider protecting the public from Justin's legal practice. With the suspension of his law license, Justin will never practice law again. Nor will he seek to. He understands he fell far, far short of professional conduct and the consequences to his clients.

In cases identified by counsel involving criminal defense attorney who distributed controlled substances, the sentences ultimately imposed were much less than 120 months:

- *United States v. Kit Lee Karjala*, Case No. 3:17-CR-00063-TMB (D. Alaska) (sentence of time served for criminal defense attorney convicted of charges related to supplying drugs to detained clients, ECF No. 638 (Judgment, Sept. 27, 2021), notwithstanding the government's argument for a within-guidelines sentence of 37 months because "defendant was a licensed attorney who chose to use that privilege in order to deliver drugs to inmates housed in the local jail." ECF No. 454 (Gov. Sentencing Memo., Sept. 9, 2020))

- *In re Castro-Ward*, Case No. 18-MC-550-GAG, 2020 WL 2538904, at *5 (D.P.R. Feb. 26, 2020) (describing defense attorney's federal prosecution related to smuggling phones and drugs to multiple detainees in federal detention center, resulting in sentence of probation)

- *United States v. Robin Dwain Dunn*, Case No. 4:23-CR-00249-BLW (D. Idaho) (defense attorney sentenced to 42 months after pleading guilty to conspiracy to distribute fentanyl and methamphetamine, ECF No. 62 (Judgment, Oct. 10, 2024))

- *United States v. Courtney Marie Peterson*, Case No. 1:25-CR-00187-RCT (D. Idaho) (criminal defense attorney sentenced to 12 months and one day after she was convicted of distributing methamphetamine to a client, who was the leader of a prison gang, ECF No. 24 (Judgment, Oct. 10, 2025))

These cases demonstrate that even a short period of incarceration is sufficient to punish and deter criminal conduct by criminal defense attorneys.

**c. Mr. Facey needs rehabilitation for his untreated drug addiction and mental health issues.**

At 46 years old, Justin is at his rock bottom. He destroyed his career and will never practice law again. He has lost everything except what is most

important—the love and support of friends and family. This is a fresh start. Justin has never participated in any treatment for his addiction or mental health issues. He is eager to begin. And his family and friends are ready to support him.

For years Justin has been able to lie to himself that he could get his addiction under control or that the stimulants were helping him do his job. This case and the suspension of his license have brutally dispelled that false belief. Justin recognizes that treatment is necessary for both his mental health and lengthy history of addiction.

This rehabilitation can begin in custody but is best addressed in the community where Mr. Facey can work to avoid relapse, address his mental health without prison restrictions (including availability of treatment providers and medications).

## Conclusion

A sentence of 120 months is appropriate in this case. It far exceeds the adjusted guideline range of 46 to 57 months (using the methamphetamine mixture guideline removing of an aggravated role adjustment) and reflects the seriousness of the offense. Mr. Facey understands and accepts the consequences of his actions. He is, however, very receptive to rehabilitation.

Dated: September 29, 2026

Nicole Owens
Federal Public Defender
By:

/s/ Melissa Winberg
Melissa Winberg
Rilie Fry
Assistant Federal Defender
Federal Defender Services of Idaho
Attorneys for Justin Abbott Facey

## Certificate of Service

I certify that I am an employee of the Federal Defender Services of Idaho, and that a copy of this document, including any attachments, was electronically served on the party or parties below.

Adam Alexander, Assistant U.S. Attorney
Jennifer Lowe Ivers, Assistant U.S. Attorney
Ryan Blackmarr, U.S. Probation Officer

Dated: September 29, 2026 /s/ Joy Fish
Joy Fish